IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BONNIE J. W., | |
| Plaintiff, | **4:23CV3187** |
| vs. | |
| MARTIN O'MALLEY, Commissioner of Social Security, | **MEMORANDUM AND ORDER ON JUDICIAL REVIEW OF COMMISSIONER'S DENIAL OF BENEFITS** |
| Defendant. | |

Plaintiff Bonnie W.[1] seeks judicial review of the denial of her application for disability insurance benefits and supplemental security income by defendant Commissioner of the Social Security Administration (the Commissioner). Filing 1 at 3. Bonnie W. has moved for an order reversing the Commissioner's decision. Filing 13. In response, the Commissioner filed a motion to affirm the Commissioner's final decision denying disability insurance benefits and supplemental security income. Filing 15. For the following reasons, the Court grants the Commissioner's motion to affirm and denies Bonnie W.'s motion to reverse.

## I. INTRODUCTION

### A. Procedural Background

Bonnie W. protectively applied for a period of disability and disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, on June 8, 2020. Filing 7-2 at 11 (Administrative Record (AR) 10). That same date, she also protectively applied for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq*. Filing 7-2 at 11 (AR 10). In both applications, Bonnie W. alleged disability beginning on December 25, 2016.

---

[1] The Court will refer to Plaintiff by first name and last initial to protect her privacy.

Filing 7-2 at 11 (AR 10). Her claims are based on impairments from the following conditions: "fibromyalgia, hypothyroidism, type 2 diabetes, depression, anxiety, sleep apnea, extreme fatigue, ptsd, [and] bi polar." Filing 7-3 at 30 (AR 112). The Social Security Administration (SSA) initially denied both applications on January 8, 2021, and again upon reconsideration on June 4, 2021. Filing 7-2 at 11 (AR 10). Bonnie W. subsequently filed a written request for a hearing by an Administrative Law Judge (ALJ) pursuant to 20 C.F.R. § 416.1429. Filing 7-2 at 11 (AR 10) (noting that Bonnie W.'s request for a hearing was received on July 7, 2021).

The ALJ held an in-person hearing on September 27, 2022, during which Bonnie W. amended her alleged disability onset date to July 2, 2019. Filing 7-2 at 11 (AR 10). On October 31, 2022, the ALJ issued a ruling in favor of the Commissioner, denying Bonnie W.'s application for a period of disability, disability benefits, and supplemental security income. Filing 7-2 at 11–28 (AR 10–27). Bonnie W. submitted a request for review of the ALJ's decision to the SSA Appeals Council on October 31, 2022. Filing 7-2 at 2–6 (AR 1–5). On September 19, 2023, the SSA Appeals Council denied Bonnie W.'s request for review because it found no reason to reverse the ALJ's decision. Filing 7-2 at 2 (AR 1). Thereafter, Bonnie W. timely filed this action on February 28, 2024, seeking judicial review of the ALJ's ruling by this Court. Filing 13 at 1.

Bonnie W. presents three principal arguments in support of her motion to reverse the Commissioner's denial of her claim for disability insurance benefits and supplemental security income. Filing 14; Filing 21. First, Bonnie W. argues that the ALJ failed to apply the correct legal standards when evaluating the medical opinions of Lane T. Handke, M.D. (Dr. Handke), one of Bonnie W.'s treating physicians, and Rachel Mann, A.P.R.N. (Ms. Mann), one of Bonnie W.'s treating mental health care providers. Filing 14 at 18–27. Second, Bonnie W. argues that the ALJ erred in his residual functioning capacity (RFC) finding because he failed to consider how Bonnie

2

W.'s previously documented and foreseeable future absences due to treatment will impact her ability to maintain full-time employment. Filing 14 at 20. Third, Bonnie W. argues that the ALJ erred in his RFC finding because he failed to apply the correct legal standards when evaluating Bonnie W.'s subjective complaints in light of the entire record. Filing 14 at 20–21. The Court will summarize the medical records and evidence related to these arguments. The Court will discuss other evidence only to the extent necessary for proper context.

**B. Factual Background**

*1. The Claimant*

On the amended alleged disability onset date of July 2, 2019, Bonnie W. was forty-three years old, meeting the definition of a younger individual under 20 C.F.R. § 416.963(c) (designating a younger person as one who is "under age 50"). Filing 7-2 at 26 (AR 25). Bonnie W. has at least a high school education, which places her in the fourth classification of educational ability, defined at 20 C.F.R. § 416.964(b)(4). Filing 7-2 at 26 (AR 25); *see also* Filing 7-6 at 4 (AR 343) (reporting that Bonnie W. had completed two years of college). Bonnie W. is not married and has lived alone and unassisted since September 9, 2021. Filing 7-5 at 5 (AR 315); Filing 7-2 at 54 (AR 53).

Bonnie W. was previously employed full-time as a certified nurse aide (CNA). Filing 7-6 at 3 (AR 342); Filing 7-2 at 50 (AR 49). She reported that her last day performing work as a CNA was December 25, 2016. Filing 7-6 at 3 (AR 342); Filing 7-2 at 50 (AR 49). At the in-person hearing held on September 27, 2022, Bonnie W. testified that she had not performed any part-time or other type of work since her last day as a CNA. Filing 7-2 at 50 (AR 49). Nevertheless, the record reflects that Bonnie W. sought and held some employment after concluding her work as a CNA on December 25, 2016, and even after her amended alleged onset date of July 2, 2019. *See* Filing 7-6 at 3, 4, 14 (AR 342, 343, 353) (reporting that Bonnie W. was still working at the time of her disability report, doing "in-home babysitting," which she began doing in May of 2020, for

three hours per day, three days a week, at a rate of sixty dollars per week or $300 per month); Filing 7-3 at 52 (AR 134) (reporting that Bonnie W. worked as a driver for Rail Crew Express for two days in 2019); Filing 7-6 at 4, 15 (AR 343, 354) (reporting that Bonnie W. trained to be a "transporter for train personne[l]," from November of 2019 to December of 2020, for five hours per day, five days per week, at a rate of twelve dollars per hour).[2]

Bonnie W. also sought work after her alleged disability onset date but without success. *See* Filing 8-1 at 152 (AR 589) (reporting that, on April 4, 2020, Bonnie W. planned to apply for a cook job at a nursing home and that she felt she would get the position); Filing 8-1 at 145 (AR 582) (reporting that, on April 29, 2020, Bonnie W. did not get the cook job because the nursing home wanted to fill the position with someone who could work full time, which Bonnie W. believed was not feasible due to her health); Filing 8-1 at 138 (AR 575) (reporting that, on May 6, 2020, Bonnie W. was continuing her job search); Filing 8-1 at 129 (AR 566) (reporting that, on May 20, 2020, Bonnie W. did not get the "other" job but was happy babysitting instead). Bonnie W. has not performed any gainful work since her amended alleged disability onset date. Filing 7-2 at 13 (AR 12) (citing 20 C.F.R. §§ 404.1571 *et seq.*, and 416.971 *et seq.*); *see e.g.,* Filing 7-3 at 65 (AR 147).

### 2. *Treating Providers' Records and Opinions*

#### a. Bonnie W.'s Long-Term Physician, Lane T. Handke, M.D

On August 18, 2018, Bonnie W. resumed outpatient care with Dr. Lane T. Handke at Faith Regional Physician Services L.L.C. to get a second opinion on the progression of her medical

---

[2] Although Bonnie W.'s disability report suggests that she held employment as a "transporter for train personne[l]" for thirteen months, Bonnie W.'s disability determination explanation and wage information suggest that she performed work in this position for fewer than three days. *See e.g.,* Filing 7-3 at 65 (AR 147) ("She reported working as a driver for Rail Crew Express for 2 days in 2019—clearly not SGA."); Filing 7-5 at 29 (AR 339) (showing that the total compensation distributed to Bonnie W. from Rail Crew Express was no greater than $227).

conditions after a three-year hiatus while she was seeing other providers. Filing 8-1 at 95–100 (AR 532–37). Thus, Bonnie W. was under Dr. Handke's care prior to her amended alleged disability onset date of July 2, 2019, up until at least August 29, 2022, with approximately twelve office visits after the alleged onset date. Filing 8-1 at 72–76, 95–100, 499–507 (AR 509–13, 532–37, 936–44); *see also* Filing 14 at 8 (plaintiff's brief describing Dr. Handke as Bonnie W.'s "long-term physician"). Prior to Bonnie W.'s amended alleged disability onset date, Dr. Handke provided the following "problem list" outlining his primary concerns relating to Bonnie W.'s health: anxiety, depression, generalized headaches, essential hypertension, hypothyroidism, type two diabetes mellitus, insomnia, palpitations, sleep apnea, polycystic ovaries, renal and ureteral stones, and obesity, each with an onset date of January 8, 2015. *See e.g.,* Filing 8-1 at 95 (AR 532).

Notwithstanding Bonnie W.'s various physical and mental conditions, Dr. Handke's records include numerous positive reports of Bonnie W.'s upbeat moods, physical health improvements, and overall well-being coinciding with periods when Bonnie W. was taking her prescribed medications. *See e.g.,* Filing 8-1 at 60–65, 475–78, 494–98 (AR 497–502, 912–15, 931–35) (specifically noting improvements in Bonnie W.'s physical and mental health conditions attributable to the consistent use of her prescribed medication); Filing 8-1 at 428, 494–98 (AR 865, 931–35) (noting that Bonnie W.'s consistent nightly use of her CPAP had "significantly" improved her energy levels and daytime wakefulness). During the relevant time period, Bonnie W. returned to see Dr. Handke several times for treatment as needed for such things as topical rashes, intermittent digestive issues, and flu-like symptoms. *See* Filing 8-1 at 55–69 (AR 492–505). During these appointments, Dr. Hanke reported Bonnie W. was "upbeat" and doing well in several of his appointment notes. *See e.g.,* Filing 8-1 at 58–59 (AR 495–96) (noting that Bonnie W. was alert, interactive, jovial, joking, making good eye contact, and that she described her recent moods

as "very good and upbeat"); Filing 8-1 at 428–30 (AR 865–67) (showing that Bonnie W. demonstrated good strength and did not exhibit any symptoms of back pain, neck pain, weakness, depression, anxiety, insomnia, mood swings, agitation, or psychosis).

For example, even though Bonnie W. had not visited Dr. Handke for fourteen months, when she saw him on May 25, 2021, Dr. Handke's progress notes did not reflect any substantial negative changes in Bonnie W.'s health since he had last seen her. *See* Filing 8-1 at 428–30 (AR 865–67) (noting Bonnie W.'s admission that she had not been very physically active but she was staying hydrated and minding her salt intake). Indeed, Dr. Handke noted that Bonnie W. had maintained "good control" of her diabetes and that she had kept off some of the weight she lost. Filing 8-1 at 428 (AR 865). Dr. Handke also wrote Bonnie W. a prescription for CPAP supplies, finding that her consistent nightly use of the CPAP had "improved her energy levels and daytime wakefulness significantly." Filing 8-1 at 428 (AR 865). Similarly, at a September 15, 2021, appointment, Dr. Handke stated that Bonnie W. demonstrated good strength and appeared to be alert, interactive, and healthy. Filing 8-1 at 494–98 (AR 931–35) (noting that Bonnie W. was not experiencing any physical pain, swelling, inflammation, weakness, numbness, fatigue, dizziness, depression, anxiety, insomnia, mood swings, agitation, or psychosis). Dr. Handke also conducted an assessment of Bonnie W.'s medical conditions, noting the following points of progress: (1) she was consistently taking her medications; (2) her blood pressure was in "excellent control" with the regular use of her medications; (3) her diabetes was under better control due to the improvements in her diet and the regular use of her medications; (4) her chronic depression was in remission with the regular use of her medications; and (5) her energy levels and daytime wakefulness had significantly improved with the nightly use of her CPAP. Filing 8-1 at 494–98 (AR 931–35).

Conversely, Dr. Hanke's more negative reports coincided with periods when Bonnie W. was not taking her medications. *See* Filing 8-1 at 490–493 (AR 927–30) (noting that Bonnie W. had stopped taking all of her medications, driving her to engage in self-harm and abandon her efforts to make healthy lifestyle changes); Filing 8-1 at 483–86 (AR 920–23) (comparatively noting Bonnie W.'s increased levels of depression, anxiousness, insomnia, hypertension, blood pressure, fatigue, and weight gain during another unmedicated period, and reporting the improvements in Bonnie W.'s health since resuming her medications). Specifically, on March 11, 2020, Bonnie W. told Dr. Handke that she could no longer afford any of her medications, save for the diabetic medications that she was receiving gratis from Dr. Brau. Filing 8-1 at 55 (AR 492). Dr. Handke advised Bonnie W. that her medications were not covered by patient assistance plans because they were generic, and he referred her to Midtown Health Center to seek further assistance with paying for her medications. Filing 8-1 at 55 (AR 492). The record does not indicate whether Bonnie W. entertained Dr. Handke's suggestion, but it does indicate that Bonnie W. informed Dr. Handke that she was planning to apply for disability and had already hired an attorney. Filing 8-1 at 55 (AR 492).

Similarly, on November 23, 2021, Bonnie W. returned to see Dr. Handke at the advice of her counselor to report the regression of her mental and physical health. Filing 8-1 at 490–493 (AR 927–30). Bonnie W. informed Dr. Handke that she had again stopped taking all her medications regularly—including her insulin—and was no longer monitoring her blood sugar levels. Filing 8-1 at 490 (AR 927). Bonnie W. stated that her depression had gotten progressively worse, and she was more forthcoming about her history of self-harm. Filing 8-1 at 490 (AR 927). She also reported that she constantly felt "on edge," angry, and irritable but could not identify a specific trigger that was eliciting these emotions. Filing 8-1 at 490 (AR 927). Bonnie W. also reported that she felt

unmotivated to make healthy lifestyle changes or engage in hobbies that she previously enjoyed. Filing 8-1 at 490 (AR 927). Dr. Handke determined that Bonnie W. was experiencing a "severe episode of recurrent major depressive disorder, without psychotic features," so he increased her dosage for Bupropion XL and advised her to resume all her medications, beginning with her evening doses that night. Filing 8-1 at 490–492 (AR 927–39). Dr. Handke also encouraged Bonnie W. to find other ways to occupy her time, such as resuming the walking program that she previously enjoyed. Filing 8-1 at 491 (AR 928). When Bonnie W. returned for a follow-up on December 7, 2021, she reported no low moods or suicidal thoughts. Filing 8-1 at 487–89 (AR 924–26). Dr. Handke recorded that Bonnie W. had regained good control of her diabetes and that her moods had improved since increasing her Bupropion XL dosage to 300mg. Filing 8-1 at 487–89 (AR 924–26) (noting that Bonnie W. also appeared more energized and somewhat more motivated since her last visit).

Despite her progress, Bonnie W. stopped taking all her medications again shortly thereafter and did not resume taking them until the week leading up to her appointment on February 23, 2022. Filing 8-1 at 483–86 (AR 920–23). At her appointment, Bonnie W. admitted that she had experienced particularly low moods and suicidal thoughts during the time that she was not taking her medications. Filing 8-1 at 483 (AR 920). Dr. Handke recorded that Bonnie W. gained ten pounds in two months due to "stress eating" and noted that her blood pressure had previously been under good control up until she stopped taking her medications. Filing 8-1 at 483 (AR 920). Despite the downturn before resuming her medications, Dr. Handke described Bonnie W.'s behavior at the appointment as upbeat, alert, and interactive, particularly noting that Bonnie W. demonstrated good eye contact, good insight, good judgment, and good strength. Filing 8-1 at 484–86 (AR 921).

8

Dr. Handke listed a comprehensive diagnosis of Bonnie W.'s health conditions during her appointment on June 8, 2022, after Bonnie W. informed Dr. Handke that she had an upcoming disability hearing. Filing 8-1 at 441–44 (AR 878–81). Dr. Handke diagnosed Bonnie W. with fibromyalgia, chronic fatigue, chronic depression, essential hypertension, morbid obesity, polycystic ovarian syndrome (PCOS), sleep apnea, and type two diabetes mellitus with other diabetic kidney complications. Filing 8-1 at 442 (AR 879). On August 29, 2022, Dr. Handke filled out Bonnie W.'s official medical impairment and physical capacities evaluation form. Filing 9-1 at 48–53 (AR 1085-90). This evaluation form primarily consisted of yes-or-no and checklist-style questions, punctuated by some explanatory short answers and fill-in-the-blank prompts. Filing 9-1 at 48–53 (AR 1085–90).

In the August 29, 2022, evaluation form, Dr. Handke (1) categorized all of Bonnie W.'s impairments as severe, lifelong, and disabling in effect; (2) opined that these impairments rendered Bonnie W. incapable of performing her previous job or similar work; (3) stated that attempting performance of such work would have an adverse effect on Bonnie W.'s health; and (4) anticipated that Bonnie W. would be absent from work more than three times a month to receive treatment for her various health conditions. Filing 9-1 at 48–53 (AR 1085-90). Dr. Handke further asserted that Bonnie W.'s pain constantly interfered with her attention and concentration, effectively taking her off-task. Filing 9-1 at 49 (AR 1086) (clarifying "constantly" as sixty-six percent of the time). The ALJ later noted, "Within his statement, Dr. Handke opined that the claimant could, amongst other limitations: (1) work for two hours per workday; (2) sit for one hour in an eight-hour workday; (3) stand for one hour in an eight-hour workday; (4) walk for one hour in an eight-hour workday; (5) occasionally lift and carry 10 pounds; and (6) work up to three days per week." Filing 7-2 at 25 (AR 24).

In the evaluation form, Dr. Handke also affirmed that Bonnie W. had followed the treatment plans he prescribed, Filing 9-1 at 49 (AR 1086), although that statement is contradicted by records discussed above indicating that Bonnie W. had not done so. *See* Filing 8-1 at 483–86, 490–493 (AR 920–23, 927–30). Furthermore, Dr. Handke reported that Bonnie W.'s condition had not improved since he first began treating her or since the initial onset of her impairments, and he concluded that there were no other treatment options available for her impairments beyond the medication already prescribed to her. *See* Filing 9-1 at 49 (AR 1086). These statements are also contradicted by statements in Dr. Handke's records noting improvements in Bonnie W.'s physical and mental health conditions attributable to the consistent use of her prescribed medication. *See* Filing 8-1 at 60–65, 475–78, 494–98 (AR 497–502, 912–15, 931–35).

      b.   Bonnie W.'s Mental Healthcare Provider, Rachel Mann, A.P.R.N.

On January 1, 2020, Bonnie W. began outpatient care with Ms. Mann at Oasis Counseling to address her mental health concerns and explore medication treatment options. *See* Filing 8-1 at 214–18 (AR 651–55); *see also* Filing 7-6 at 96 (AR 435) (describing Ms. Mann as Bonnie W.'s "primary mental health medication provider"). Bonnie W. remained under Ms. Mann's care until her last appointment on June 2, 2021, during which Ms. Mann informed Bonnie W. that Dr. Handke would be taking over the management of Bonnie W.'s psychiatric medication. Filing 8-1 at 214–18 (AR 650–55). Thus, Bonnie W. stopped seeing Ms. Mann more than a year before the hearing before the ALJ on September 27, 2022. Filing 7-2 at 11 (AR 10). Bonnie W. met with Ms. Mann approximately thirteen times during the relevant time period. *See* Filing 8-1 at 106 (AR 543); *see generally* Filing 9-1; *but see* Filing 14 at 28 (asserting that there were 19 visits with Ms. Mann). Ms. Mann often hosted these appointments virtually via phone. *See e.g.* Filing 8-1 at 106 (AR 543) (showing that Bonnie W. had ten appointments with Ms. Mann in 2020, six of which were specifically documented as virtual phone appointments).

Ms. Mann adhered to the same appointment routine during both virtual and in-person appointments. *See e.g.,* Filing 8-1 at 111–113, 126–28, 135–37, 142–44, 149–51, 168–71, 174–76, 185–87, 196–98, 399–401, 413–16 (AR 548–50, 563–65, 572–74, 579–81, 586–88, 605–08, 611–13, 622–24, 633–35, 836–38, 850–53). During each appointment, Ms. Mann: (1) recorded how Bonnie W. rated and/or described the status of her symptoms since her last appointment; (2) recorded general notes on Bonnie W.'s physical health and mental functionality; and (3) provided a summation of Bonnie W.'s diagnosis and treatment plan. *See e.g.,* Filing 8-1 at 111–13 (AR 548–50) (showing an example of Ms. Mann's pre-formatted appointment notes for reference).

During each appointment, Bonnie W. described how her symptoms had been fairing since she last saw Ms. Mann. *See e.g.,* Filing 8-1 at 111–113 (AR 548–550). One of the ways that Ms. Mann assessed the severity of Bonnie W.'s symptoms was by having Bonnie W. subjectively rate her moods, anxiety, and depression using numerical scales and questionnaires. *See e.g.,* Filing 8-1 at 142–44, 214–18 (AR 579–81, 650–55) (explaining that Bonnie W. rated her moods, anxiety, and depression "[o]n a scale of 1 to 10, with 1 being the best and 10 being the worst . . . ."); Filing 8-1 at 142–44 (AR 579–81). Ms. Mann consistently recorded how Bonnie W. rated her moods and occasionally recorded how Bonnie W. rated her anxiety and depression levels. *Compare* Filing 8-1 at 149–51 (AR 586–88) (showing that, on April 22, 2020, Ms. Mann had Bonnie rate her moods on a scale from one to ten but did not have Bonnie W. rate her anxiety or depression levels), *with* Filing 8-1 at 126–28 (AR 563–65) (showing that Bonnie W. rated her moods on a scale from one to ten and completed questionnaires to rate her anxiety and depression levels during her appointment with Ms. Mann on May 21, 2020); Filing 8-1 at 111–113 (AR 548–550) (showing that, on June 26, 2020, Ms. Mann had Bonnie W. rate her mood on a scale from one to ten but reused Bonnie W.'s previous anxiety and depression ratings from May 21, 2020).

11

On the occasions that Ms. Mann recorded the cumulative ratings from Bonnie W.'s anxiety and depression questionnaires, the results varied from non-existent to severe. *Compare* Filing 8-1 at 126–28 (AR 563–65) (rating Bonnie W.'s anxiety levels at a five and depression levels at a six—indicating no anxiety or depression), *with* Filing 8-1 at 142–44 (AR 579–81) (rating Bonnie W.'s anxiety levels at a sixteen and depression levels at a nineteen—indicating severe anxiety or depression); Filing 8-1 at 399–401, 413–16 (AR 836–38, 850–53), Filing 9-1 at 15–16, 30–31 (AR 1052–53, 1067–68) (showing occasions where Bonnie W.'s anxiety levels were rated at sixteen but labeled as indicating moderate anxiety). During the majority of her appointments, Bonnie W. rated her moods at a three, four, or five out of ten and supported each rating with positive descriptions of her mood. *See* Filing 8-1 at 111–13, 126–28, 135–37, 150–51, 185–87, 214–18, 399–401 (AR 548–50, 563–65, 572–74, 586–88, 622–24, 650–55, 836–38), Filing 9-1 at 30–31 (AR 1067–68) (showing eight occasions where Bonnie W. rated her moods at a three, four, or five out of ten, typically coupled with positive descriptors like "fair," "better," and "pretty good"); *but see* Filing 8-1 at 214–18 (AR 650–55) (showing that Bonnie W. rated her moods at a five out of ten but described her moods as "indifferent"). Otherwise, Bonnie W.'s mood ratings did not exceed a seven out of ten. *See* Filing 8-1 at 142–44, 168–71, 174–76, 196–98, 413–16 (AR 579–81, 605–08, 611–13, 633–35, 850–53), Filing 9-1 at 15–16 (AR 1052–53) (showing six occasions where Bonnie W. rated her moods at a six or seven, typically coupled with negative descriptors like "struggling," "dumpy," and "depressed"); *cf.* Filing 8-1 at 168–71 (AR 605–08) (showing that Bonnie W. rated her moods at a seven out of ten but described her moods as "pretty fair"); Filing 9-1 at 15–16 (AR 1052–53) (showing that Bonnie W. rated her moods at a six out of ten but described her moods as "pretty good").

During each appointment, Ms. Mann also recorded general notes on Bonnie W.'s physical health and mental functionality. *See e.g.,* Filing 8-1 at 111–13 (AR 548–50) (showing that Ms. Mann routinely assessed Bonnie W.'s "general physical, [her] activities of daily living, ability to meet [her] responsibilities, status of [her] interpersonal relationships, and use of alcohol or other substances," taking into account any available data from previous medical examinations). None of Ms. Mann's appointment notes reflect that Bonnie W. expressed any physical complaints. Filing 8-1 at 111–13, 126–28, 135–37, 142–44, 149–51, 168–71, 174–76, 185–87, 196–98, 399–401, 413–16 (AR 548–50, 563–65, 572–74, 579–81, 586–88, 605–08, 611–13, 622–24, 633–35, 836–38, 850–53), Filing 9-1 at 15–16, 30–31 (AR 1067–68) (AR 1052–53) ("[Bonnie W.] had no current physical complaints."). As for Bonnie W.'s mental functionality, Ms. Mann consistently recorded that Bonnie W. demonstrated average intelligence and did not have any apparent learning barriers hindering her understanding or intellect. Filing 8-1 at 111–13, 126–28, 135–37, 142–44, 149–51, 168–71, 174–76, 185–87, 196–98, 399–401, 413–16 (AR 548–50, 563–65, 572–74, 579–81, 586–88, 605–08, 611–13, 622–24, 633–35, 836–38, 850–53), Filing 9-1 at 15–16, 30–31 (AR 1067–68) (AR 1052–53) ("[Bonnie W.] is ready to learn with no apparent learning barriers. . . . [She] asked appropriate questions and expressed understanding. . . . Her intelligence quotient (IQ) is estimated as average."). Furthermore, Bonnie W. consistently presented herself as friendly, cooperative, calm, and collected. Filing 8-1 at 111–13, 126–28, 135–37, 142–44, 149–51, 168–71, 174–76, 185–87, 196–98, 399–401, 413–16 (AR 548–50, 563–65, 572–74, 579–81, 586–88, 605–08, 611–13, 622–24, 633–35, 836–38, 850–53), Filing 9-1 at 15–16, 30–31 (AR 1067–68) (AR 1052–53) (noting that Bonnie W. was friendly and cooperative, maintained good eye contact, sat calmly without fidgeting, effectively communicated her thoughts, and demonstrated good memory, insight, and judgment).

Ms. Mann concluded her appointment notes by providing a summation of Bonnie W.'s diagnosis and treatment plan. In doing so, Ms. Mann adjusted Bonnie W.'s medications as needed, noted any discussion of alternative treatment options, and advised Bonnie W. of ways to improve her health by implementing "risk" reduction strategies. *See e.g.,* Filing 8-1 at 111–13 (AR 548–50). In terms of "risk" reduction strategies, Ms. Mann consistently encouraged Bonnie W. to seek therapy, eat healthily, stay hydrated, regularly exercise in moderation, get adequate sleep, refrain from drinking or using drugs, and consistently take all her prescribed medications. Filing 8-1 at 111–13, 126–28, 135–37, 142–44, 149–51, 168–71, 174–76, 185–87, 196–98, 399–401, 413–16 (AR 548–50, 563–65, 572–74, 579–81, 586–88, 605–08, 611–13, 622–24, 633–35, 836–38, 850–53), Filing 9-1 at 15–16, 30–31 (AR 1067–68) (AR 1052–53).

On January 3, 2021, over a year and a half before Bonnie W.'s hearing before the ALJ, Ms. Mann provided a medical source statement based on her clinical evaluations of Bonnie W. and other test results. Filing 7-1 at 25 (AR 24); *see* Filing 8-1 at 431–40 (AR 868–77) (clarifying that Ms. Mann completed Bonnie W.'s mental impairment and mental capacities evaluation even earlier on September 14, 2020, after nine months of treating Bonnie W.). Ms. Mann opined that Bonnie W. suffered from the following ascertainable psychological impairments and conditions: (1) mild bipolar disorder II; (2) mild PTSD, and (3) mild insomnia. Filing 8-1 at 431 (AR 868) (showing that Ms. Mann marked all of these impairments as "not disabling," but did note Bonnie W.'s morbid obesity as disabling); *see also* Filing 8-1 at 431 (AR 868) (showing that Ms. Mann reported that Bonnie W. followed her prescribed treatment and that her condition had improved since beginning treatment). Ms. Mann opined that the limitations posed by Bonnie W.'s ascertainable psychological impairments and conditions ranged from "not significantly limited" to "markedly limited." Filing 8-1 at 434–36 (AR 871–73). Ms. Mann further opined that Bonnie W.'s

14

ability to adjust to and to perform a variety of work-related activities ranged from "unlimited" to "poor." Filing 8-1 at 438–39 (AR 875–76). For example, Ms. Mann reported that Bonnie W.'s morbid obesity, poor concentration/attention span, and inconsistent moods would affect Bonnie W.'s ability to manage work stresses, follow instructions, and demonstrate reliability. Filing 8-1 at 438–39 (AR 875–76). As a result, Ms. Mann opined that Bonnie W. could work zero to three days per week for three or more hours, but less than six hours per day. Filing 8-1 at 436 (AR 873). These opinions are inconsistent with Ms. Mann's records discussed above showing that Bonnie W. demonstrated average intelligence and did not have any apparent learning barriers hindering her understanding or intellect, and that Bonnie W. consistently presented herself as friendly, cooperative, calm, and collected.

### 3. Bonnie W.'s Self-Assessment of Functionality

Bonnie W. completed a disability report, Form SSA-3368, and a function report, Form SSA-3373, on June 17, 2020, which was more than two years before the hearing before the ALJ. Filing 7-6 at 2–9 (AR 341–48); Filing 7-6 at 32–43 (AR 371–82). In her disability report, Bonnie W. claimed that her ability to work was limited by the following medical conditions: (1) fibromyalgia; (2) hypothyroidism; (3) type two diabetes; (4) depression; (5) anxiety; (6) sleep apnea; (7) extreme fatigue; (8) posttraumatic stress disorder (PTSD); and (9) bipolar disorder. Filing 7-6 at 3 (AR 342). While Bonnie W. did report that she was still working at the time, she elaborated that the status of her medical conditions required her to make changes in her work activity. Filing 7-6 at 3 (AR 342) (reporting that she made unspecified changes in her work activity on December 25, 2016). Filing 7-6 at 4 (AR 343) (reporting that Bonnie W. was providing home daycare for one child, three hours per day, three days a week, at a rate of sixty dollars per week).

In her function report, Bonnie W. supplemented her disability report by explaining the ways her conditions limit her activities. Filing 7-6 at 32–43 (AR 371–82). Bonnie W. stated that

15

her ability to work is limited by her persistent fatigue, inability to comfortably maintain a seated or standing position, inability to perform handheld tasks for prolonged periods, and unpredictable declines in her mental/physical health. Filing 7-6 at 32–33 (AR 371–72). Bonnie W. explained that she has trouble getting adequate sleep and still feels the need to nap even after a restful night's sleep. Filing 7-6 at 32 (AR 371). Bonnie W. also stated that it takes her a long time to complete basic household chores because she has to take frequent breaks to change her position. Filing 7-6 at 32 (AR 371). Bonnie W. elaborated that if she does not take breaks to resituate herself, she experiences "terrible back pain" and fears that her legs will give out. Filing 7-6 at 32 (AR 371); *see also* Filing 7-2 at 52–54 (AR 51–54) (showing that Bonnie W. attributed her pains to her fibromyalgia but she had never seen a specialist to address her fibromyalgia in the twenty years that she has experienced these pains). Bonnie W. also reported that she experiences pain in her neck and arms, as well as numbness in her hands and fingers, when performing handheld tasks for prolonged periods of time. Filing 7-6 at 33 (AR 372). Bonnie W. ultimately described herself as unreliable because she cannot anticipate sudden declines in her mental/physical health. Filing 7-6 at 33 (AR 372) ("No one wants a worker that may/will call in frequently ill because of aches, pains, or tiredness that is so debilitating that they need to stay in bed or resting in a chair all day."); Filing 7-6 at 43 (AR 382) (stating that her anxiety and depression prevent her from accomplishing the things she wants to do, sometimes emotionally overwhelming her to the point of feeling physically ill); Filing 7-6 at 41 (AR 380) (describing her memory, focus, and concentration when completing tasks as poor).

During her in-person hearing on September 27, 2022, Bonnie W. testified that she has lived alone and unassisted since September 9, 2021. Filing 7-2 at 54 (AR 53). Bonnie W. further testified that she independently manages herself and her household. Filing 7-2 at 54–55 (AR 53–54) (noting

that Bonnie W. cooks, cleans, buys groceries, and drives herself places); Filing 7-2 at 51 (AR 50) (noting Bonnie W's testimony that she manages her mental health by attending therapy every other week, and that the benefits of receiving mental health treatment "really changed things a lot" for her). Bonnie W. also testified that her daughter and granddaughter live approximately forty-five minutes away and that she drives out to visit them about once a month. Filing 7-2 at 54 (AR 53).

Although Bonnie W. testified that she is self-sufficient in her home life, she stated that she does not feel fit to work because of the limitations imposed by her physical and mental health conditions. *See* 7-2 at 50–76 (AR 49–75). Bonnie W. testified that she requires multiple breaks during tasks to rest and resituate her position in order to mitigate her physical pain and numbness. Filing 7-2 at 56–59 (AR 55–58). Bonnie W. explained that the pain is most severe in her shoulder blades, neck, lower back, and thighs, while the numbness is most noticeable in her hands and arms. Bonnie W. testified that these areas become easily agitated when she has to spend a "long period of time" sitting, standing, or performing a handheld task. Filing 7-2 at 56–59 (AR 55–58) (defining a "long period of time" as fifteen minutes). *But see* Filing 7-2 at 60 (AR 59) ("There's no specific rhyme or reason to the pain. When it comes, it comes.").

When asked to rate the highest level of physical pain she experiences in a given day on a scale from one to ten, Bonnie W. replied, "seven." Filing 7-2 at 59 (AR 58) (showing that Bonnie W. was asked to rate her most severe pain "using a scale of zero to ten, with zero being no pain at all and ten being the most excruciating pain that you can imagine"); *but see* Filing 7-2 at 60–62 (AR 59–61) (noting that Bonnie W. later reported a pain level of eight when asked about her drive to visit her daughter, eight-and-a-half when asked about her two-and-a-half-hour drive to the courthouse for the in-person hearing, and eight when she was doing the dishes "last Saturday"). Bonnie W. further testified that she experiences level seven pains approximately eight or nine

times each day, each lasting around half an hour and forcing her to rest until the pain passes. Filing 7-2 at 59 (AR 58).

### C.  The ALJ's Determinations

#### 1.  The ALJ's Impairment Findings

Pursuant to 20 C.F.R. § 416.920(a), an ALJ will conduct a five-step sequential analysis to determine whether a claimant is disabled. *See Grindley v. Kijakazi*, 9 F.4th 622, 628 (8th Cir. 2021) (citing *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012)). When determining whether the claimant is disabled, the ALJ will consider the following:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work

*Grindley*, 9 F.4th at 628 (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal citation omitted)). On the first four steps of the process, the claimant generally bears the burden of proving he or she is disabled, while the burden shifts to the Social Security Administration on step five. *See* 20 C.F.R. §§ 416.912(a)–(b), 416.960(c). If the ALJ determines that the claimant is not disabled at steps one, two, four, or five, or finds the claimant is disabled at steps three or five, the ALJ will conclude the analysis. *See* 20 C.F.R. § 416.920(a), (h).

At the first step of the disability analysis, the ALJ will find that the claimant is not disabled if the claimant is engaged in a form of work that constitutes "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i); *see also* 20 C.F.R. § 404.1520(a)(4)(i). Substantial gainful activity is defined as "work activity that is both substantial and gainful." 20 C.F.R. § 416.972; *see also* 20 C.F.R. § 404.1572. Substantial work activity is any "work activity that involves doing significant physical or mental activities," even if the work is performed on a part-time basis. 20 C.F.R. § 416.972(a); *see also* 20 C.F.R. § 404.1572(a). Gainful work activity is any work activity that is done, or usually

18

done, "for pay or profit . . . whether or not a profit is realized." 20 C.F.R. § 416.972(b); *see also* 20 C.F.R. § 404.1572(b). Furthermore, if a claimant has received earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that the claimant has demonstrated the ability to engage in substantial gainful activity. 20 C.F.R. §§ 416.974, 416.975. In this case, the ALJ found that Bonnie W. had not engaged in any substantial gainful activity since the amended alleged onset date of July 2, 2019. Filing 7-2 at 13 (AR 12).

At the second step of the disability analysis, the ALJ determines if the claimant has a medically determinable impairment or a severe combination of impairments. 20 C.F.R. § 416.920(a)(4)(ii); *see also* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant does not have "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities," the ALJ will find that the claimant is not disabled. 20 C.F.R. § 416.920(c). In this case, the ALJ found that Bonnie W. had the following severe impairments,[3] which significantly limit her ability to perform basic work activities: fibromyalgia, diabetes mellitus, major depressive disorder (MDD), bipolar disorder, generalized anxiety disorder (GAD), and PTSD. Filing 7-2 at 13–14 (AR 12–13). This determination permitted the ALJ to continue to step three.

At the third step of the disability analysis, the ALJ determines whether the claimant's impairment or combination of impairments meets the criteria of severity listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; *see* 20 C.F.R. § 416.920(a)(4)(iii); *see also* 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment or combination of impairments meets the listed severity criteria, the ALJ will find the claimant to be disabled. 20 C.F.R. § 416.920(d); *see also* 20 C.F.R. §

---

[3] The ALJ also found that Bonnie W. has the following non-severe impairments: obesity, mild spondylosis, hypertension, hyperlipidemia, hypothyroidism, chronic fatigue syndrome, and sleep apnea. Filing 7-2 at 13 (AR 12). The ALJ determined that these impairments were non-severe "because they do not cause more than minimal limitations in the claimant's ability to perform basic work activities." Filing 7-2 at 14 (AR 13).

404.1520(d). If the claimant's impairment or combination of impairments does not meet the listed severity criteria, the ALJ will proceed to the fourth step of the disability analysis. 20 C.F.R. § 416.920(e); *see also* 20 C.F.R. § 404.1520(e). In this case, the ALJ found that Bonnie W. did not have an impairment or combination of impairments that met the listed severity criteria and subsequently proceeded to the fourth step of the disability analysis. Filing 7-2 at 15 (AR 14).

### 2.   *The ALJ's RFC Findings*

At the fourth step of the disability analysis, the ALJ will first determine the claimant's RFC and then consider the claimant's RFC in the context of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv); *see also* 20 C.F.R. § 404.1520(a)(4)(iv). A claimant's RFC is defined as "the most [the claimant] can do despite [his or her] limitations." 20 C.F.R. § 416.945(a)(1); *see also* 20 C.F.R. § 404.1545(a)(1). Generally, the claimant has the burden of producing the evidence that the ALJ will use to determine the claimant's RFC. *See Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004) (citing *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004)); *see also* 20 C.F.R. §§ 416.912(a)(1), 416.945(a)(3), 404.1512(a)(3). "'The ALJ determines a claimant's RFC based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'" *Koch v. Kijakazi*, 4 F.4th 656, 667 (8th Cir. 2021) (quoting *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (alteration in original) (internal citation omitted)); *see also* 20 C.F.R. §§ 416.945(a)(3), 404.1545(a)(3). With respect to Bonnie W.'s RFC, the ALJ concluded:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for two hours in an eight-hour workday. She can sit for six hours in an eight-hour workday. She can occasionally climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch, and crawl. She can frequently finger, feel, and handle with her bilateral upper extremities. She must avoid concentrated exposure to extremely high temperatures, humidity, loud noise, and unprotected heights. She can

20

> understand, follow, and complete simple, routine, and repetitive tasks and instructions
> in jobs that are low stress (having no more than occasional changes in the work setting
> and requiring no more than occasional decision-making).

Filing 7-2 at 18 (AR 17).

After determining the claimant's RFC, the ALJ will then consider the claimant's RFC in the context of the claimant's past relevant work. 20 C.F.R. §§ 404.920(a)(4)(iv), 416.960(a); *see also* 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is defined as any substantial gainful work activity performed by the claimant within the past fifteen years and lasting for a duration of time sufficient for the claimant to learn how to perform the work. 20 C.F.R. § 416.960(b)(1); *see generally* 20 C.F.R. § 416.965(a). The ALJ will assess the claimant's ability to perform past relevant work by weighing the claimant's RFC against the physical and mental demands of the claimant's past relevant work. 20 C.F.R. § 416.920(f); *see also* 20 C.F.R. § 404.1520(f). If the claimant can perform her past relevant work, the ALJ will find that the claimant is not disabled. 20 C.F.R. § 416.920(f); *see also* 20 C.F.R. § 404.1520(f). Conversely, if the claimant cannot perform her past relevant work, the ALJ will continue to the fifth and final step of the disability analysis. 20 C.F.R. § 416.920(f); *see also* 20 C.F.R. § 404.1520(f). If the claimant has no past relevant work, the ALJ may still consider the claimant's "ab[ility] to do unskilled work because it requires little or no judgment and can be learned in a short period of time." 20 C.F.R. § 416.965(a). In this case, the ALJ found that Bonnie W. was unable to perform any of her past relevant work. Filing 7-2 at 26 (AR 25).

### 3.  The ALJ's Findings Regarding Ability to do Other Work

At the fifth and final step of the disability analysis, the ALJ determines the claimant's ability to adjust to other work existing in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c); *see also* 20 C.F.R. § 404.1520(a)(4)(v). At this step, the Commissioner adopts the limited burden of providing "evidence about the existence of other work in the national economy

that [the claimant] can do," in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 416.912(a)(1),(b)(3), 404.1512(a)(1),(b)(3); *see also Goff*, 421 F.3d at 790 (quoting *Eichelberger*, 390 F.3d at 591) (addressing the Commissioner's limited burden in the fifth step of the disability analysis). That said, the claimant maintains the general burden of establishing his or her disability. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2001)). If the ALJ finds that the claimant can adjust to other work existing in the national economy, the ALJ will find that the claimant is not disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(g). Conversely, if the ALJ finds that the claimant cannot adjust to other work, or that the pertinent forms of other work do not exist in the national economy, the ALJ will find that the claimant is disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(g); *see generally* 20 C.F.R. § 404.1566.

In determining the claimant's ability to adjust to other work existing in the national economy, the ALJ may have a vocational expert (VE) testify at the disability hearing. 20 C.F.R. § 416.966(e); *see also* 20 C.F.R. § 404.1566(e). The VE will "take into account medical limitations, including opinions as to work time limits, and offer an opinion on the ultimate question whether a claimant is capable of gainful employment." *Swedberg v. Saul*, 991 F.3d 902, 905 (8th Cir. 2021) (quoting *Smallwood v. Charter*, 65 F.3d 87, 89 (8th Cir. 1995)). In this case, VE Julie Svec testified at the disability hearing as to Bonnie W.'s ability to adjust to other work existing in the national economy. Filing 7-2 at 76–82 (AR 75–81) (showing the transcript of VE Julie Svec's sworn testimony offered at the disability hearing via phone call). First, the ALJ asked the VE if a hypothetical person of Bonnie W.'s age and education could perform Bonnie W.'s past relevant work "as a nurse aid either as she did it or as it's done nationally" with the following capabilities and limitations:

> [A]ssume this individual is capable of performing a full range of light work but has no ability to climb ropes, ladders or scaffolds and is able to occasionally climb ramps and

stairs, to stoop, kneel, crouch and crawl as well as frequently feel, finger and handle with both upper extremities. The individual should have no concentrated exposure to extreme high temperatures, humidity, loud noises or unprotected heights and is able to understand, follow and complete simple, repetitive, routine tasks and instructions in jobs that are defined -- in jobs that are low stress, a job defined as having no more than occasional changes in a work setting and requiring no more than occasional decision making.

Filing 7-2 at 78 (AR 77). The VE testified that such a person could not perform Bonnie W.'s past work as a nurse aid. Filing 7-2 at 78 (AR 77).

Second, the ALJ asked the VE if there were any other jobs available in the national economy for the same hypothetical person described in the first question. Filing 7-2 at 79 (AR 78). In response, the VE gave an inexhaustive list of light, unskilled job positions with significant availability in the national economy that she believed the hypothetical individual would be able to perform:[4] "folder" 369.687-018; "bottle packer" 920.685-026; and "housekeeper" 323.687-014. Filing 7-2 at 79 (AR 78). The ALJ then asked the VE if those light, unskilled jobs would still be possible if the same hypothetical person had the "ability to stand or walk for two hours out of an eight-hour workday." Filing 7-2 at 79 (AR 78). The VE testified that this variation in the hypothetical person's ability rendered the VE's previous job examples impossible. Filing 7-2 at 79 (AR 78). Instead, the VE provided an inexhaustive list of sedentary, unskilled job positions with significant availability in the national economy that she believed the hypothetical individual would still be able to perform: "telephone clerk" 237.367-046; "order clerk" 209.567-014; and "weight tester" 539.485-010. Filing 7-2 at 79–80 (AR 78–79). Finally, the ALJ asked the VE if there was an acceptable number of absences or amount of time off-task due to psychologically-based symptoms or pain that an employee could accrue and still retain employment. Filing 7-2 at 80 (AR

---

[4] The Social Security Administration primarily relies on the *Dictionary of Occupational Titles* (DOT) for gathering information about occupations in the national economy. Every occupational title in the DOT has a corresponding nine-digit identification number. *How to Find an Occupational Title and Code*, Informational Technology Associates (Apr. 11, 2020), https://occupationalinfo.org/front_580.html.

79). The VE opined that, on average, an employee's time off-task should not exceed ten percent of their workday and their average absences should not exceed one day per month. Filing 7-2 at 80 (AR 79) (showing the VE's opinion that employees are "not allowed" to exceed the stated metrics for permissible time off.).

Bonnie W.'s attorney then asked the VE a string of interrelated hypothetical questions. Filing 7-2 at 81–82 (AR 80–81). Bonnie W.'s attorney first asked the VE to consider the ALJ's first hypothetical question, taking the hypothetical person as the ALJ described but with the following additional facts: (1) the hypothetical person would be required to visit a therapist twice a month; (2) each visit would require the hypothetical person to take time out of their workday to drive approximately thirty minutes to the session and thirty minutes back from the session; and (3) each session could last up to sixty minutes. Filing 7-2 at 81 (AR 80). Considering these facts, Bonnie W.'s attorney asked the VE if the hypothetical person would be precluded from continuing their employment as identified in the ALJ's first hypothetical question. Filing 7-2 at 81 (AR 80). The VE testified that the amount of time off-task described in the attorney's hypothetical "typically would not be allowed," and that the hypothetical person would not be allowed to continue the work identified in the ALJ's first hypothetical question. Filing 7-2 at 81 (AR 80).

Bonnie W.'s attorney then asked the VE if her answers to the ALJ's first hypothetical question would change if she was asked to "take the [ALJ's] first hypothetical question in its entirety and add to it" the limitations outlined in Ms. Mann's mental impairment and mental capacities evaluation of Bonnie W. Filing 7-2 at 81–82 (AR 80–81) (showing that Bonnie W.'s attorney: (1) directly referenced Ms. Mann's mental impairment and mental capacities evaluation of Bonnie W.; (2) verbally identified the limitations reflected in Ms. Mann's evaluation; and (3) clarified that "for purposes of this hypothetical question a moderate limitation means up to 10%

24

of the time and a marked limitation means between 10 and 20% of the time"). The VE testified

that incorporating Ms. Mann's evaluation into the ALJ's first hypothetical question would likely

change her answers because she "[didn't] think those jobs would be possible." Filing 7-2 at 82

(AR 81). When Bonnie W's attorney asked the VE to clarify whether this change was attributable

to "all of the interruptions" that the facts implied, the VE replied, "[y]es, you had me consider all

of those things together plus the [ALJ's] first hypothetical." Filing 7-2 at 82 (AR 81).

Upon considering the VE's testimony, along with Bonnie W.'s age, education, work

experience, and RFC, the ALJ concluded that Bonnie W. was not disabled at the final step of the

disability analysis. Filing 7-2 at 27 (AR 26); *see generally* 20 C.F.R. §§ 416.920(g)(1),

404.1520(g)(1).

## II. LEGAL ANALYSIS

### A. Standard of Review

After a claimant has sought review of an ALJ's decision by the Appeals Council and has

been denied benefits, the claimant is entitled to judicial review of the ALJ's decision in federal

district court. *Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019); *see also* 42 U.S.C. § 405(g). On

review, the district court determines "whether substantial evidence on the record as a whole

supports the ALJ's decision." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quoting

*Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009) (internal citation omitted)). Substantial

evidence has been described as "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148,

1154 (2019) (citation omitted) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Id.* (quoting *Consol. Edison Co.*, 305 U.S. at 229); *see Despain v. Berryhill*,

926 F.3d 1024, 1027 (8th Cir. 2019) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir.

2000)).

Under the substantial evidence standard, the district court will consider "evidence that detracts from the [ALJ's] decision, as well as evidence that supports it." *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) (citing *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007)). However, the district court will not reverse an ALJ's decision "simply because some evidence supports a conclusion other than that reached by the [ALJ]." *Id.* (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)). The district court will affirm the ALJ's decision "[i]f, after reviewing the record, the [district] court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings." *Dols v. Saul*, 931 F.3d 741, 744 (8th Cir. 2019) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)). Moreover, the district court will not reverse the ALJ's decision simply because the district court "would have come to a different conclusion" on its own. *Id.* (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (internal citations omitted)); *see also Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000) ("We will not reverse the [ALJ's] decision 'merely because substantial evidence supports a contrary outcome.'")). Stated another way, the district court "will only disturb the ALJ's decision 'if it falls outside the available zone of choice.'" *Ross v. O'Malley*, 92 F.4th 775, 778 (8th Cir. 2024) (quoting *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021) (internal citation omitted)). An ALJ's decision "is not outside the zone of choice because [the district] court might have reached a different conclusion if [it was] the initial factfinder." *Id.* The district court should also defer to the ALJ's credibility determinations as long as they are supported by good reasons and substantial evidence. *See Despain*, 926 F.3d at 1028.

Additionally, the district court is tasked with determining whether the ALJ's decision "complies with the relevant legal standards." *Lucas v. Saul*, 960 F.3d 1066, 1068 (8th Cir. 2020)

(internal citations omitted) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (internal citations omitted in original) (quoting *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011)). In conducting its review of the ALJ's decision under the substantial evidence standard, the district court "must review the record in the light most favorable to [the ALJ's] determination." *Dols*, 931 F.3d at 748 (alteration in original) (quoting *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam)).

**B. Discussion**

As stated in the factual background above, Bonnie W. asserts three principal arguments in support of her motion to reverse the Commissioner's denial of her claim for disability insurance benefits and supplemental security income. First, Bonnie W. maintains that the ALJ failed to apply the correct legal standards when evaluating the medical opinions of Dr. Handke and Ms. Mann. Filing 14 at 18–27. Second, Bonnie W. asserts that the ALJ erred in his RFC finding because he failed to consider how Bonnie W.'s previously documented and foreseeable future absences due to treatment will impact her ability to maintain full-time employment. Filing 14 at 20. Third, Bonnie W. avers that the ALJ erred in his RFC finding because he failed to apply the correct legal standards when evaluating Bonnie W.'s subjective complaints in light of the entire record. Filing 14 at 20–21. Each of these principal arguments contain assertions of related sub-issues, which will be sequentially addressed in full below.

*1. The ALJ Adhered to the Correct Legal Standards in Evaluating and Ultimately Discrediting the Medical Opinions of Dr. Handke and Ms. Mann*

a. Bonnie W.'s Arguments

Bonnie W. first argues that the ALJ improperly discredited the medical opinions of Dr. Handke and Ms. Mann. Filing 14 at 18–27. Specifically, Bonnie W. alleges that the ALJ failed to

27

articulate sufficient reasons for finding Dr. Handke's and Ms. Mann's medical opinions unpersuasive. Filing 14 at 18–27. Bonnie W. asserts that "the ALJ did not note or identify any inconsistencies existing between the medical record as a whole and the opinions of [Dr. Handke or Ms. Mann]." Filing 21 at 2–3, 5. Bonnie W. also notes that the ALJ only dedicated two paragraphs to analyzing Dr. Handke's and Ms. Mann's medical opinions. Filing 21 at 2–3, 5. Bonnie W. relatedly avers that the ALJ "came to the result of rejecting medical opinions pursuant to 20 C.F.R. §[]404.1520c(a) without performing a methodical examination of all of [Dr. Handke's and Ms. Mann's] opinions." Filing 21 at 2–3, 5.

Bonnie W. further asserts that the ALJ should have considered Dr. Handke's and Ms. Mann's advantageous access to pertinent medical records and comparatively extensive histories of evaluative contact with Bonnie W. when analyzing the consistency of Dr. Handke's and Ms. Mann's opinions with those of the other medical professionals in this case. *See* Filing 21 at 2–6. In arguing that the ALJ failed to convey proper consideration of all pertinent medical evidence, Bonnie W. asserts that the ALJ rejected unrebutted evidence and impermissibly interpreted raw medical data. Filing 21 at 3–7.

  b. The ALJ Properly Considered the Consistency and Supportability of the Medical Opinions by Dr. Handke and Ms. Mann in the Context of the Record as a Whole.

Contrary to Bonnie W.'s assertions, the ALJ sufficiently articulated his reasons for finding Dr. Handke's and Ms. Mann's medical opinions unpersuasive by addressing their consistency and supportability within his analysis. The Eighth Circuit Court of Appeals has established that "[a]n ALJ does not need to discuss the other factors under 20 C.F.R. § 404.1520c(b)(2) after discussing the supportability and consistency of a treating physician's opinion." *Nolen v. Kijakazi*, 61 F.4th 575, 577 (8th Cir. 2023); *see generally* 20 C.F.R. § 416.920c(b)(2) (indicating that an ALJ is only required to consider supportability and consistency when evaluating the persuasiveness of medical

opinions and prior administrative medical findings but may also consider other factors). The ALJ

demonstrated consideration of the consistency and supportability of Dr. Handke's and Ms. Mann's

medical opinions when he explained that their opinions were "largely inconsistent with the weight

of the current record." Filing 7-2 at 25–26 (AR 24–25); *see Bowers*, 40 F.4th at 875 (holding that

an ALJ's decision was supported by substantial evidence on the record as a whole where a treating

physician's opinion was contradictory in part and unsupported by objective medical evidence);

*Kraus*, 988 F.3d at 1024 (quoting *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) ("An ALJ

may give 'limited weight' [to a treating physician's opinion] if they 'provide[] conclusory

statements only, or [are] inconsistent with the record.'")).

For example, Dr. Handke opined that Bonnie W.'s condition would inhibit her from

performing more than approximately two hours of work per workday. Filing 7-2 at 25 (AR 24).

The ALJ concluded that Dr. Handke's opinion was inconsistent with multiple reports of Bonnie

W.'s daily living activities, physical status results, treatment history, and medical imaging. Filing

7-2 at 25 (AR 24). The ALJ illustrated that conclusion as follows:

> The claimant's fibromyalgia, diabetes, mellitus, and accompanying symptoms are
> largely mild to moderate in nature (see B1F/6; B2F/22; B14F/3; B18F/22; B19F/85).
> The claimant also exhibited a steady gait, five out of five strength, full range of motion,
> intact sensation, and/or normal reflexes during numerous examinations (see, e.g.,
> B1F/6; B2F/22; B14F/3; B18F/22). Furthermore, the claimant's fibromyalgia, diabetes
> mellitus, and accompanying symptoms improve with medication and lifestyle changes
> (see B1F/8, 22; B2F/7, 19; B14F/2; B18F/13, 23). In addition, the claimant can perform
> a wide variety of activities of daily living (see B5E/1-12; B6E/1-10; B1F/13, 26;
> B3F/48, 65; Testimony).

Filing 7-2 at 25 (AR 24). *Contra* Filing 21 at 2–3, 5 (arguing that "the ALJ did not note or identify

any inconsistencies existing between the medical record as a whole and the opinions of Dr.

Handke.").

Similarly, Ms. Mann opined that Bonnie W. was only capable of working zero to three

days per week. Filing 7-2 at 25 (AR 24); Filing 8-1 at 436 (AR 873). The ALJ stated that Ms.

Mann's opinion was inconsistent with multiple reports of Bonnie W.'s daily living activities, mental status, treatment history, and examination results:

> The claimant is of average intelligence (see, e.g., B1F/13, 26; B3F/8, 71, 113; B10F/11, 24, 42; B13F/20; B19F/85, 123; Testimony). The claimant also exhibited intact cognitive functioning, memory, thought content, insight, and/or judgment during numerous examinations (see, e.g., B1F/13; B2F/16, 34; B3F/8; B10F/11, 42; B13F/ 20; B19F/84). Furthermore, the claimant did not exhibit difficulty hearing, reading, breathing, understanding, concentrating, or talking during her June 17, 2020, teleclaim with S. Drahota (see B3E/2-3). In addition, the claimant can perform a wide variety of activities of daily living (see B5E/1-12; B6E/1-10; B1F/13, 26; B3F/48, 65; Testimony).

Filing 7-2 at 25 (AR 24). *Contra* Filing 21 at 2–3, 5 (arguing that "the ALJ did not note or identify any inconsistencies existing between the medical record as a whole and the opinions of Ms. Mann").

The ALJ also explicitly stated his rationale for finding the opinions of Dr. Handke and Ms. Mann unpersuasive:

> [Dr. Handke and Ms. Mann] did not support [their] opinions with detailed explanations indicating which specific piece of objective evidence supported each particular finding. In fact, [their] statement[s] appear[] to be little more than a checklist-style form in which [they] offered conclusions without identifying the objective evidence [they] relied upon in forming those conclusions. Finally, [they were] not able to consider additional evidence that became available after [offering their] opinions.

Filing 7-2 at 25–26 (AR 24–25). The Eighth Circuit has maintained that a "conclusory report from a treating physician may still be entitled to controlling weight if it is accurate when viewed in the context of the medical record." *Despain*, 926 F.3d at 1028 (citing *Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003)). However, the ALJ may properly discredit such a report if there is substantial evidence that "it is unsupported by the medical record." *Id.* (citing *Stormo*, 377 F.3d at 805–06). Here, the medical evidence in the record supports a finding that the medical opinions of Dr. Handke and Ms. Mann were conclusory and inaccurate, so that they were not entitled to controlling weight.

For instance, Dr. Handke opined that Bonnie W. was practically unemployable due to the plethora of workplace limitations necessitated by her health conditions and the strain that continuing treatment would put on her work schedule. *See* Filing 9-1 at 51–53 (AR 1088-90) (stating Dr. Handke's opinion that Bonnie W. would require autonomy to take numerous breaks throughout the day, some of which would require her to leave her workstation); Filing 9-1 at 48–53 (AR 1085-90) (stating Dr. Handke's opinion that Bonnie W.'s impairments were completely disabling and that she would miss work more than three times per month to continue necessary treatment); Filing 7-2 at 25 (AR 24) (illustrating the extensive workplace limitations that Dr. Handke opined Bonnie W. would require). Dr. Handke affirmed that: (1) his opinion reflected his cumulative findings after years of treating Bonnie W.; (2) Bonnie W. had followed the treatment plans he prescribed; and (3) Bonnie W.'s condition had not improved since he first began treating her or since the initial onset of her impairments. Filing 9-1 at 48–49 (AR 1085–86). However, the record indicates that Dr. Handke's positive reports of Bonnie W.'s health status coincided with periods when Bonnie W. was taking her prescribed medications, while his more negative reports coincided with periods when Bonnie W. was not taking her medications. *Compare* Filing 8-1 at 60–65, 475–78, 494–98 (AR 497–502, 912–15, 931–35) (noting that Bonnie W.'s physical and mental health conditions had improved with the consistent use of her prescribed medication), *with* Filing 8-1 at 490–493 (AR 927–30) (noting that Bonnie W. had stopped taking all her medications, driving her to engage in self-harm and abandon her efforts to make healthy lifestyle changes); Filing 8-1 at 483–86 (AR 920–23) (noting Bonnie W.'s increased levels of depression, anxiousness, insomnia, hypertension, blood pressure, fatigue, and weight gain during another unmedicated period, and reporting the improvements in Bonnie W.'s health since resuming her medications). Besides improvement with medication, Dr. Handke's appointment notes also

evidence improvements in Bonnie W.'s mental and physical health when she implemented physical activity, consumed a healthier diet, and went to therapy. Filing 8-1 at 428 (AR 865) (noting that Bonnie W. had maintained "good control" of her diabetes and kept off some of the weight she lost); Filing 8-1 at 483 (AR 920) (explaining that Bonnie W.'s "constant contact" with her counselor had helped her moods stabilize after an unmedicated period). Bonnie W.'s improvement with medication and activity, diet, and therapy is inconsistent with Dr. Handke's opinions about her having followed the treatment plans he prescribed and lack of improvement since he first began treating her or since the initial onset of her impairments.

Thus, there is substantial evidence to support the ALJ's finding that Dr. Handke's extreme opinions of Bonnie W.'s limitations were largely inconsistent with the record as a whole. *Bowers, 40 F.4th at 875* (holding that an ALJ's decision was supported by substantial evidence on the record as a whole where a treating physician's opinion was contradictory in part and unsupported by objective medical evidence); *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling." (quotations omitted)); *see also Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (holding that the claimant's noncompliance with a prescribed diet and medication was not excusable because the conflicting evidence in the record provided "little or no evidence expressly linking [the claimant's] mental limitations to such repeated noncompliance.").

Much like Dr. Handke, Ms. Mann opined that Bonnie W. would be considerably limited in her ability to adapt to, perform in, and contribute to the workplace. Filing 8-1 at 434–36, 438–39 (AR 871–73, 875–76) (stating that Bonnie W.'s level of impairment ranged from "not significantly limited" to "markedly limited" and that Bonnie W.'s foreseeable work abilities ranged from "unlimited" to "poor"). Ms. Mann's appointment notes illustrate variable symptomology as

reported by Bonnie W., always with some lingering degree of depression or anxiety. Nevertheless, the overwhelming majority of Ms. Mann's appointment notes reflect her objective evaluation that Bonnie W. consistently presented herself as intellectually capable, communicative, friendly, cooperative, calm, and collected. Filing 8-1 at 111–13, 126–28, 135–37, 142–44, 149–51, 168–71, 174–76, 185–87, 196–98, 399–401, 413–16 (AR 548–50, 563–65, 572–74, 579–81, 586–88, 605–08, 611–13, 622–24, 633–35, 836–38, 850–53), Filing 9-1 at 15–16, 30–31 (AR 1067–68) (AR 1052–53). Thus, there is substantial evidence to support the ALJ's finding that Ms. Mann's opinions of Bonnie W.'s RFC limitations were "largely inconsistent" in light of the record as a whole. *See Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (quoting *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) (holding that an ALJ is justified in discounting a treating physician's opinion when said opinion "is inconsistent with the physician's clinical treatment notes.")); *Bowers*, 40 F.4th at 875 (8th Cir. 2022).

### c. The Length and Depth of the ALJ's Analysis is Sufficient in Light of Substantial Evidence on the Record as a Whole.

Bonnie W. also challenges the brevity of the ALJ's analysis, contending that the ALJ failed to demonstrate a comparison of all available medical opinions. Filing 21 at 2–3, 5; Filing 14 at 18–27. The particular length of the ALJ's succinct analysis is not at issue because, as explained above, there is substantial evidence on the record as a whole to support the ALJ's finding that Dr. Handke's and Ms. Mann's medical opinions are unpersuasive. Filing 7-2 at 25–26 (AR 24–25); *see Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016) (affirming the ALJ's comparatively "cursory" analysis of a medical opinion because the ALJ's decision was supported by substantial evidence in the record); *see also Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009) (internal citation omitted) (explaining that the standard of review is "whether substantial evidence on the record as a whole supports the ALJ's

decision.")). The ALJ did not err in declining to compare every medical opinion by Dr. Handke and Ms. Mann with every alternative medical opinion on the record because the ALJ "is not required to 'explicitly . . . reconcile every conflicting shred' of medical evidence." *Austin v. Kijakazi*, 52 F.4th 723, 729 (8th Cir. 2022) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)); 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) ("[The ALJ] is not required to articulate how [he] considered each medical opinion . . . from one medical source individually.").

Bonnie W. relatedly argues that Dr. Handke's and Ms. Mann's extensive treatment histories and access to pertinent medical records should have strengthened the basis of their opinions, especially when weighed against the opinions of other medical professionals in this case. Filing 21 at 2–3, 5; Filing 14 at 18–27. As previously explained, an ALJ may but is not required to extend analytical discussions of persuasiveness beyond the factors of consistency and supportability. *Nolen*, 61 F.4th at 577. Therefore, the ALJ did not need to specifically address the duration of Dr. Handke's and Ms. Mann's treatment relationship with Bonnie W. or the extent of their document retention before properly discrediting both of their medical opinions. 20 C.F.R. §§ 404.1520c(b)(2),(c)(3–5), 416.920c(b)(2),(c)(3–5); *see also Halverson*, 600 F.3d at 929–30 (internal quotation and citation omitted) ("When a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight.").

In light of the discussion of the ALJ's analysis, Bonnie W. incorrectly asserts that the ALJ rejected unrebutted evidence and impermissibly interpreted raw medical data within the treatment notes. Filing 21 at 6. Bonnie W. challenges the ALJ's analysis of Dr. Handke's and Ms. Mann's medical opinions, stating that "the ALJ is not qualified to assess claimant's residual functional capacity based on the bare medical record." Filing 21 at 6 (quoting *Berrios Lopez v. Sec. of Health and Human Services*, 951 F.2d 427, 430 (1st Cir. 1991)). However, the ALJ did not purport to

adopt the role of a medical provider or medical expert in considering evidence from the record. *Kribble v. Kijakazi*, 663 F. Supp. 3d 1016, 1027–28 (E.D. Mo. 2023) (citing *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) ("Simply noting contrary evidence available in the record is not 'playing doctor.'")). Furthermore, the ALJ was not left with a "bare medical record" by discrediting the medical opinions of Dr. Handke and Ms. Mann. *Compare Berrios Lopez*, 951 F.2d at 430–32 (describing the medical record as "bare" because "no other record evidence adequately discussed claimant's exertional impairments in functional terms"), *with* Filing 7-2 at 23–24 (showing that Thomas Martin, MD, Rhonda Oestreich, PLMHP, and Chelsea Race, PsyD, also provided detailed function-by-function assessments of Bonnie W.'s RFC). In sum, the ALJ was sound in discrediting any medical opinions by Dr. Handke and Ms. Mann that were verifiably inconsistent with substantial objective evidence on the record as a whole. *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) ("The ALJ may . . . disregard [a treating physician's] opinion if . . . the treating physician has offered inconsistent opinions."); *Webster v. Astrue*, 628 F. Supp. 2d 1073, 1089 (D. Neb. 2009) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 887–88 (8th Cir. 2006) ("In formulating a RFC, the ALJ need only include those limitations which she found to be credible.")); *see also Berrios Lopez*, 951 F.2d at 430–32 (holding that an ALJ's RFC finding solely based on reports by two non-testifying, non-examining physicians was adequately supported by substantial evidence).

### 2. The ALJ Properly Considered Bonnie W.'s Past and Foreseeable Absences in Assessing her Ability to Maintain Full-Time Employment

#### a. Bonnie W.'s Arguments

Bonnie W. also argues that the ALJ erred in his RFC finding because he failed to consider how Bonnie W.'s previously documented and foreseeable future absences will impact her ability to maintain full-time employment. Filing 14 at 20. Specifically, Bonnie W. alleges that her level

of absenteeism due to treatment is incompatible with the ALJ's RFC finding, as evidenced by her treatment history and the VE's responses to hypotheticals about levels of absenteeism precluding work posed by her counsel. Filing 14 at 20, 27–29.

      b. Bonnie W. Failed to Establish that Her Level of Absenteeism Would Preclude Employment

During the disability hearing on September 27, 2022, the VE opined that, on average, an employee's time off-task should not exceed ten percent of their workday and their average absences should not exceed one day per month. Filing 7-2 at 78 (AR 79). Bonnie W.'s attorney subsequently asked the VE to consider the ALJ's first hypothetical question with the following additional facts: (1) the hypothetical person would be required to visit a therapist twice a month; (2) each visit would require the hypothetical person to take time out of their workday to drive approximately thirty minutes to the session and thirty minutes back from the session; and (3) each session could last up to sixty minutes. Filing 7-2 at 81 (AR 80). The VE testified that the amount of time off-task described in the attorney's hypothetical "typically would not be allowed," and that the hypothetical person would not be allowed to continue the work identified in the ALJ's first hypothetical question. Filing 7-2 at 81 (AR 80). Bonnie W. cites these hypotheticals as evidence that her level of absenteeism precludes employment because she allegedly averaged 2.8 appointments per month between July 1, 2019, and September 27, 2022. Filing 14 at 28 (specifically noting that this metric included medical appointments, therapy appointments, and hospital visits).

Although the ALJ is responsible for ultimately determining a claimant's RFC, "the burden is on the claimant to establish his or her RFC." *Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016) (citing *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015)). Bonnie W.'s argument mistakenly oversimplifies what constitutes evidence establishing absenteeism precluding work. Filing 14 at

28 ("It is a simple matter of determining what the absences have been and what the likelihood is that such a pattern of care will continue going forward."). Bonnie W. has shown the general frequency of her appointments, but she has not demonstrated that these appointments were each directly related to her ascertainably severe impairments, nor has she shown that each appointment would require her to miss a full day of work. *Compare Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir. 2000) (holding that the ALJ did not err by failing to consider the plaintiff's absenteeism because the plaintiff's "extrapolation of how many days she must have missed from work based on her medical record [was] faulty" where it was "not limited to time missed due to her [severe impairments and] it assume[d] she was required to miss entire days of work for each appointment."); *with Green v. Saul*, 519 F. Supp. 3d 478, 494 (S.D. Iowa 2021) (finding that the plaintiff's testimony regarding foreseeable absenteeism was substantially supported on the record as a whole, noting that the plaintiff attended approximately 103 appointments between 2016–18 and often missed entire days of work due to pain); *Baker v. Apfel*, 159 F.3d 1140, 1146 (8th Cir. 1998) (finding that the physician's opinion regarding the claimant's excessive absenteeism specifically due to frequent Demerol injections necessitated by sudden debilitating migraines caused by claimant's severe impairment was well supported by "page after page" of the record).

Bonnie W. also rejects the Commissioner's argument that she could schedule her appointments around standard working hours, reasoning that "most of the medical providers perform their work during the same set of hours and days." Filing 21 at 9 (identifying standard working hours as eight a.m. to five p.m. from Monday through Friday). Nonetheless, nothing in the record indicates that Bonnie W. would be precluded from exploring alternative solutions, such as continuing to attend virtual appointments, potentially utilizing her lunch hour to attend appointments, scheduling her appointments before or after work, and so on. *See Jeffries v.*

37

*Berryhill*, No. 4:16 CV 18 JMB, 2017 WL 365439, at *6–7 (E.D. Mo. Jan. 25, 2017); *Jason P. P. v. Kijakazi*, No. 20-CV-688 (TNL), 2021 WL 4483040, at *16 (D. Minn. Sept. 30, 2021) (quoting *Morin v. Colvin*, No. 4:14-CV-000769-NKL, 2015 WL 4928461, at *9 (W.D. Mo. Aug. 18, 2015) ("[S]imply because a claimant requires regular healthcare appointments does not necessarily mean he cannot work on the days he has appointments, such as by arranging appointments around the work schedule or during breaks, nor even that the claimant would need to miss an entire work day for an appointment.")). Thus, Bonnie W.'s assertion of the general frequency of her appointment history is not supported by substantial evidence on the record as a whole. *See Jason P. P.*, No. 20-CV-688 (TNL), 2021 WL 4483040, at *16 (D. Minn. Sept. 30, 2021) (quoting *Jefferies v. Berryhill*, No. 4:16 CV 18 JMB, 2017 WL 365439, at *6 n.5 (E.D. Mo. Jan. 25, 2015) ("In essence, Plaintiff is arguing that the frequency of his medical appointments renders him disabled. Respectfully, 'if this Court were to adopt Plaintiff's argument, then any [claimant] could establish disability simply by scheduling monthly doctor's appointments.'")).

c.  The ALJ Was Not Required to Utilize the VE's Answers to the Hypothetical Questions that Were Based on Dr. Handke and Ms. Mann's Medical Opinions

Bonnie W.'s attorney posed hypothetical questions to the VE about levels of absenteeism precluding work that expressly relied on Ms. Mann's opinion of Bonnie W.'s limitations and somewhat leaned on Dr. Handke's opinion that Bonnie W. would miss work more than three times per month. Filing 7-2 at 81–82 (AR 80–81) (stating that Bonnie W.'s attorney posed hypotheticals incorporating the limitations identified by Ms. Mann and hypotheticals incorporating a limitation that the person in question would have to take time off work two days a month to attend therapy); *see* Filing 9-1 at 48–53 (AR 1085-90) (stating Dr. Handke's opinion that Bonnie W. would miss work more than three times per month to continue necessary treatment). However, the ALJ was not required to utilize the VE's answers to hypothetical questions based on Dr. Handke and Ms.

Mann's medical opinions in rendering his judgment where the ALJ had discredited their opinions. *Compare Webster*, 628 F. Supp. 2d at 1089 (citing *Lacroix*, 465 F.3d at 887–88 ("In formulating a RFC, the ALJ need only include those limitations which she found to be credible.")), *with Kraus*, 988 F.3d at 1027 (holding that the VE's answer to a hypothetical question incorporating limitations that were not reflected in the RFC did not constitute substantial evidence).

### 3. *The ALJ Properly Considered Bonnie W.'s Subjective Complaints*

#### a. Bonnie W.'s Arguments

Bonnie W.'s third contention is that the ALJ erred in his RFC finding because he failed to apply the correct legal standards when evaluating Bonnie W.'s subjective complaints in light of the entire record. Filing 14 at 20–21. Specifically, Bonnie W. alleges that the ALJ failed to pose a properly framed hypothetical to the VE that incorporated Bonnie W.'s allegations of ongoing pain and its impact on her ability to work. Filing 14 at 29–33. As a result, Bonnie W. asserts that the ALJ erroneously relied on a narrow review of Bonnie W.'s gradual improvement without considering the underlying operative limitations caused by her ongoing pain. Filing 14 at 29–33.

#### b. The ALJ Correctly Presented Hypothetical Questions to the VE by Effectively Incorporating the Impairments that were Supported on the Record as a Whole

A reviewing court "normally defer[s] to an ALJ's credibility determination." *Grindley*, 9 F.4th at 630 (citing *Halverson*, 600 F.3d at 932) ("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination.") (citation omitted)). In *Polaski v. Heckler*, the Eighth Circuit established the standard for an ALJ's evaluation of a claimant's subjective complaints. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). This standard requires the ALJ to consider all evidence relating to the following factors: "(i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage,

effectiveness, and side effects of medication; and (v) the claimant's functional restrictions." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017) (citing *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016)); *see Polaski*, 739 F.2d at 1322. That said, "[a]n ALJ need not expressly cite the *Polaski* factors when . . . [conducting] an analysis pursuant to 20 C.F.R. § 416.929, because the regulation 'largely mirror[s] the *Polaski* factors.'" *Vance*, 860 F.3d at 1120 (quoting *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007)); *see* 20 C.F.R. §§ 416.929(c)(3), 404.1520(c)(3).

"A hypothetical is not insufficient because it does not include all the health limitations alleged by the claimant." *Kraus*, 988 F.3d at 1027. "The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Martise*, 641 F.3d at 927 (quoting *Lacroix*, 465 F.3d at 889). In the present case, the ALJ considered Bonnie W.'s reported symptoms in light of all medical evidence and reports of Bonnie W.'s daily living activities before ultimately finding that Bonnie W.'s subjective complaints were inconsistent with the record as a whole. Filing 7-2 at 19–21 (AR 18–20). Regarding Bonnie W.'s physical impairments, the ALJ found that "[her] statements regarding the intensity, persistence, and limiting effects of her fibromyalgia, diabetes mellitus, and accompanying symptoms [were] inconsistent with the weight of the record." Filing 7-2 at 19 (AR 18). The ALJ reasoned that: (1) these physical impairments were "largely mild to moderate in nature," as evidenced by the positive results of numerous medical evaluations and some of Bonnie W.'s subjective ratings; (2) Bonnie W. testified on September 27, 2022, that she was not receiving treatment for her fibromyalgia; and (3) Bonnie W.'s physical impairments and accompanying symptoms improve with medication and lifestyle changes. Filing 7-2 19–20 (AR 18–19) (providing evidentiary examples from the record to support the ALJ's conclusions); *see also Aguiniga*, 833 F.3d at 902 (concluding that the ALJ properly discounted the claimant's subjective

complaints because "[the claimant] had not sought treatment for some of the complained limitations, the objective medical evidence was inconsistent with several of her allegations," and the claimant had occasions of non-compliance with suggestions by her treating physician).

Regarding Bonnie W.'s psychological impairments, the ALJ found that "[her] statements regarding the severity and limiting effects of her major depressive disorder (MDD), bipolar disorder, generalized anxiety disorder (GAD), posttraumatic stress disorder (PTSD), and accompanying symptoms [were] inconsistent with the weight of the record." Filing 7-2 at 20 (AR 19). The ALJ reasoned that: (1) these psychological impairments ranged from "largely mild to moderate in nature," as evidenced by numerous examinations by Bonnie W.'s healthcare providers; (2) Bonnie W. remained "alert, oriented, cooperative, and appropriate during numerous examinations," despite her recurrent depression; and (3) Bonnie W.'s psychological impairments and accompanying symptoms improve with medication and therapy, as evidenced by Bonnie W.'s subjective reports of her symptoms during her appointments and her testimony on September 27, 2022. Filing 7-2 at 20 (AR 19) (providing evidentiary examples from the record to support the ALJ's rationale); *see also Brown*, 390 F.3d at 540 (quotations omitted) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."). The ALJ also provided examples from the record demonstrating that Bonnie W.'s statements regarding the severity of her impairments and accompanying symptoms were largely inconsistent with her activities of daily living. Filing 7-2 at 20 (AR 19). The ALJ reasoned that Bonnie W. demonstrated: (1) sustainable self-sufficiency as an individual living alone; (2) an ability to be social and cooperative with others; and (3) some confidence in resuming employment, as evidenced by her application for a cook position after her alleged disability onset date and her statement that she thought she would get the job. Filing 7-2 at 20 (AR 19).

While Bonnie W. may disagree with how the ALJ weighed the evidence in his analysis, "it is not this Court's role to reweigh that evidence." *Schmitt v. Kijakazi*, 27 F.4th 1353, 1361 (8th Cir. 2022) (citing *Johnson v. Colvin*, 788 F.3d 870, 872 (8th Cir. 2015)). In weighing the evidence, the ALJ ultimately found that Bonnie W.'s subjective complaints were inconsistent with the record as a whole. Filing 7-2 at 19–21 (AR 18–20). As the analysis above indicates, the ALJ's finding is supported by substantial evidence and falls within the "available zone of choice." *See Ross*, 92 F.4th at 778 (citing *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) ("A decision is not outside of the zone of choice because this court might have reached a different conclusion if we were the initial factfinder.")). Therefore, the ALJ properly considered Bonnie W.'s subjective complaints and did not err in declining to pose a hypothetical to the VE that incorporated them all. *See Martise*, 641 F.3d at 927 (holding that the ALJ did not err by failing to ask the VE a hypothetical question that incorporated the claimant's subjective limitations because the ALJ's findings were supported by substantial evidence).

## III. CONCLUSION

The Court concludes that substantial evidence supports the ALJ's decision that Bonnie W. is not disabled. Accordingly,

IT IS ORDERED that

1.    Bonnie W.'s Motion for Order Reversing the Commissioner's Decision, Filing 13, is denied;

2.    The Commissioner's Motion to Affirm Commissioner's Decision, Filing 15, is granted;

3.    The Commissioner's decision is affirmed; and

4.    The Court will enter a separate judgment.


Dated this 5th day of September, 2024.

                                        BY THE COURT:

                                        _____
                                        Brian C. Buescher
                                        United States District Judge